Mr. Chief Justice, and may it please the Court, in the PG&E case, this Court held that although the State of California had the undisputed regulatory power to place a moratorium on the construction of new nuclear plants, it was preempted under the Atomic Energy Act from the State of California to impose a moratorium on the construction of new nuclear plants. It was preempted from using that undisputed de jure authority as a means for indirectly and de facto regulating the nuclear safety of nuclear plants. Because the bottom line in that case was no preemption. That's true, Your Honor. So to say, well, they had they said all this stuff along the way, but the bottom line judgment, and that was true in English as well, no preemption. Your Honor, and the reason that the Court in PG&E came to that conclusion was it accepted the court of appeals' interpretation of State law that the purpose of that regulatory, that the courts or the California's exercise of regulatory authority was not for the purpose of protecting against radiation hazards, which is the line drawn in the statute between what is Federal and what is State. So PG&E, Your Honor, as I say, clearly held that the State could not use its acknowledged authority to indirectly and de facto regulate an activity that was in the exclusive authority of the NRC, and in this case What if it's dual purpose? Well, Your Honor, Which a lot of things are going to be in this context. That's true, Your Honor. So how does that work? Justice Kavanaugh, in a case where it's a dual purpose, this Court in PG&E said, is it grounded in the impermissible purpose? Is it grounded in the courts of appeals have had no problem examining situations where, and that's going to be true in most legislation. Well, but Mr. Cooper, then we, don't we get into trouble under Shady Grove of guessing what the motivations of a State legislature are and all the methodological, epistemological, and Federalism questions that that raises. What do we do about that? Your Honor, this Court, in a variety of contexts, is called upon to examine the legislative purpose of a particular enactment. I know we do it in the 14th Amendment context, for example, but I'm hard-pressed to come up with many other examples where we look at a State legislative purpose and decide its permissibility based on our assessment of legislative motive. Well, Your Honor, and we have not been able to find another statute where Congress has prescribed a purpose-based preemption standard, but Congress has nonetheless in terms that are quite clear and in terms that this Court in PG&E accepted and implemented made purpose the line between what is State and what is Federal with respect to the regulation of nuclear power development. So we're just stuck with purpose, whether we like it or not. I got it. That's the bottom line, yes, Your Honor. But is PG&E perhaps distinguishable on this basis that at least there, California was directly regulating the construction of nuclear power plants, prohibiting them, and that is an area under, what is it, 2021C that's expressly preempted. Here you have efforts to regulate mining and upstream activity that are not expressly dealt with in the statute. So what do we do about that? Your Honor, I don't think that distinguishes PG&E at all, because in PG&E, the State was using its acknowledged power to decide whether nuclear power plants would be constructed. And to see the activity. I'm sorry to interrupt, but I just want to narrow the question so that we might be more productive for me, hopefully for me. There, California was regulating construction, and that's dealt with by C. But K, I grant you, 2021K, does seem to have a carve-out based on purpose. Yes. You got me there. Okay? Yes. But I think Justice White was saying, well, within the construction world, all right, we have this carve-out under K that we have to deal with. And California might regulate construction for purposes other than safety considerations, for economic or other considerations. But what do we do about it when a State comes along and says, I'm not even going to regulate construction. I'm not even going to get into that game. I'm not in the C game at all. Why would we look at K? Why would we look at anything? Why wouldn't we just say, this is just not an area that Congress regulated? Congress just couldn't come to agreement on how to regulate mining. Well, to come back to PG&E, what California regulated was not construction. It preempted construction. It pre-dermitted construction. And what the Atomic Energy Act gives the NRC regulatory control of is how a plant is constructed. So before you get to the how, California answered the whether. And this Court acknowledged that that was within its authority. But what it couldn't do was use that de jure authority over whether to effectively and indirectly regulate the nuclear safety of the operation of the plant. The State of Virginia is doing exactly the same thing here. It's using its ---- Ginsburg. Suppose Virginia had said, we think that the extraction is a dangerous activity. So we are justifying this ban on mining to protect the workers from the hazards associated with mining, not with milling or tallying, just mining. Then I take it you would lose, right? I would lose, Your Honor. Yes. I would lose if that was the State of Virginia's genuine purpose. What the Congress has asked the courts to do is to determine the purpose of a state regulation, state regulations ranging in this body of law from a state very creatively denying municipal services such as fire and police, sewer garbage, to restricting access on its public roads in order to use those sovereign powers in order to prevent the coming into existence the regulatory power of the NRC in the first place. And that is what PG&E says quite reasonably states cannot do. If they could do that, it would make a mockery, as this Court said in the National Meat Association case, it would make a mockery of the purpose-based preemption standard that Congress has prescribed. I might just be repeating Justice Gorsuch's question, but you conceded if they talk about mining hazards that that's you lose, and I appreciate the candor. But what if the legislation is written to protect against mining hazards and of the 60 members of the legislature, 20 of them say this is a great way to keep nuclear energy out of the State, and we should do that. What is the purpose of that legislation? Still to protect against mining hazards, or do you look behind it and say, well, a third of them thought it was a good way to keep nuclear power out? How do you analyze that question? Your Honor, the courts can't accept simply as written what the State may say in terms of what the purpose is. That's exactly what happened in the Entergy case from the Second Circuit. The legislature in Vermont was acutely aware of PG&E and acutely aware of trying to avoid preemption. And so on the face of the statute, it articulated non-safety rationales for what was, the Court of Appeals determined, its concealed purpose, which was radiation hazards of nuclear power generation. So the courts really have to look behind to see if, in fact, the legislature is motivated and its purpose is a prohibited radiation hazard. Is this going to require deposing every single legislative member? No, Your Honor. Because what do you look at? In a lot of these things, people just vote. They don't say why. Or they do what one of my colleagues suggested. They give mixed motives. This is an odd way to read a preemption statute. Your Honor, I know of no case that I'm aware of anyway when this Court and the Federal Courts go about the what is ordinary business of trying to determine legislative purpose where legislators have been deposed. That is not what we have in mind. What the courts look to in these cases are the standard, ordinary indicia of objective purpose. What does the text say? By the way, the text in this case says a lot about that. But what is the legislative history? What are the historical context of the legislation itself? What was the legislature addressing? But you would concede, Mr. Cooper, the two states with exactly the same statutes, it could come out different ways because the legislative history was different in the two states? It could, Your Honor. If the purpose animating the legislature through the best good faith examination of the courts looking at that issue came to the conclusion that, yes, this genuine and nonprohibited purpose was the but-for purpose, if you will, of the legislation. Yes, that is up. It seems to present real opportunities for gamesmanship as well, sort of bad incentives for a State to just cover over your purpose. Your Honor, and we have seen that. We have seen that in cases that have been decided in this line. As I was saying, the Entergy case itself, the legislature was very careful to attempt to obscure what was in the courts determined quite properly what was genuinely animating the legislative body in that case. And it's not unusual in this particular area. And when Congress determined to create a system of dual regulation and drew the line between the purpose of the State to regulate radiation hazards, it was reserving for the Federal Government that particular area with good reason. It was allowing the States to regulate in the area of electric generation as they had always done. And to, if the States would have regulated this particular plant as though it was a fossil fuel plant, then there would be no doubt that its purposes were not nuclear safety. But how are we going to tell that in most cases? Justice Kagan's question about two State laws are going to be treated differently based on our inquiry or the Federal Court's inquiry into the subjective motive seems very odd. The thing that concerns me about this is how this is going to work. Your Honor. And one way would be, as Justice Sotomayor said, subjective motivations, depositions. You rightly say, I think, that that's not what you're looking for. So what is it? You ask whether the State can articulate a legitimate non-safety rationale? That's a possible answer. That's too low, I think you're going to say. You're right. I am going to say that. But then what is the answer for something workable that makes sense here? That's what's bothering me. Your Honor, I think if you're groping, if you were for a framework for courts to analyze this, it seems to me the court in Arlington Heights produced a perfectly apt way for courts to approach this. If the person, the plaintiff challenging the preemption of the statute, can demonstrate that the prohibited purpose was a motivating factor, then the State has to come in and show that it would have been enacted even in the absence of the motivating factor. And again, the Congress drew the line here because it wanted to ensure, and this was, the purpose is actually in this, a narrowing preemption. Because typically, if the State enacts a measure, regardless of what its purpose is, that is an indirect regulation of that which is exclusively Federal, as in the National Meat Association case, the court doesn't look into what the purpose was. It simply preempts it quite properly. This actually takes the standard preemption doctrine and is State, it's friendlier to the State's interests, because it allows States, as Kay explicitly says, to regulate the materials at issue, source, by-product, and special nuclear materials, for purposes other than protection against radiation hazards. But when it comes to something that dramatically important, protection against radiation hazards of these nuclear materials, the Congress wanted that to be exclusively Federal, and so it drew the line on purpose. If I may reserve the balance of my time, Mr. Chief Justice. Roberts. Thank you, counsel. General Francisco. Mr. Chief Justice, and may it please the Court. Under the Atomic Energy Act, Virginia can ban uranium mining because it thinks that mining isn't safe. Because it thinks mining is what? Because mining isn't safe. But what it can't do is ban uranium mining because uranium processing isn't safe. Can you, the Federal Government, order the State to permit and regulate mining? No, Your Honor. I don't think so. So if you can't do that, then how can you force them or judge any reason they give for saying, I don't want to do it? Well, Your Honor, this is simply a straightforward preemption analysis. And all that's required here is to order them to do it. But you just told me you can't order them to mine. Right. Or to apply safety reasons. So if you can't order them to do it, wouldn't we be in effect doing that if we said your purpose for not wanting to do this is preempted? Now you must? Not in the slightest, Your Honor. Because if Virginia's mining ban were preempted, Virginia wouldn't have to do anything. It could apply its existing mining laws. It could adopt a new mining law if it wanted. Or it could leave the entire area completely unregulated. But the one thing that Pacific Gas tells us that it can't do is it can't use the authority that it does have to reach into and indirectly regulate something reserved exclusively to the Federal Government. May I go back to Justice Gorsuch's question about PG&E and whether it's the same as or different from this case? And this might be just a different way of saying what he said. But it does seem to me that when you're talking about construction of a nuclear plant, there's obvious dual authority between the Federal Government and the States. 2018 gives a lot of authority to the States. And then 2021C clearly makes this a part of what the Commission looks at. And, you know, Mr. Cooper said there's the whether question and the how question. But honestly, if you think about the thing, there's dual authority in one area. And it seems to me that that's not true here, where the Act specifically says that the Commission's authority starts when the materials are extracted from the earth and has nothing to do with what happens prior to that. So isn't the separation involved in these two activities very different from the separation involved in the PG&E context? So my answer to your question is no. And if I could explain by reference also to the facts of some other cases. Take Skull Valley, for example. There, the State, everyone agreed, had complete authority over the use of the roadways. But what the State couldn't do was effectively shut down a spent nuclear fuel facility by preventing any fuel from reaching the facility in the first place by way of the roads. General, I understand that's a nice Tenth Circuit case, so well done. But it doesn't bind this Court. So what do we do about – I'm stuck where Justice Kagan is, and so it's not going to help me to set a Tenth Circuit case. I'm sorry, colleagues. But I want to know from first principles why PG&E isn't simply explained as a construction case. Sure. And construction – I don't see whether and how in the statute in C. I see construction, period. Right. And California was regulating construction in some fashion. Right. Here it's mining. And maybe Congress should have preempted in mining instead of just starting with milling. But it didn't. So why isn't that the end of the case? Because I think the answer to your question is that neither PG&E nor anything that we're arguing here is really a nuclear-specific rule. Take the National Meat Association case, for example, a decision of this Court. The Federal Government had exclusive regulatory authority over slaughterhouse operations. And what the Court made clear was that the State couldn't use its authority over the sales of meat to reach into and indirectly regulate slaughterhouse operations. Here, the purpose inquiry actually narrows the scope of preemption, because not only does the State have to use the authority that it does have to reach into and indirectly touch upon something that the Federal Government regulates, it has to do so for a very specific and impermissible purpose. And I think that if you adopted a contrary rule, unlike the one adopted by the Fourth Circuit, it really is a roadmap for completely undermining a multibillion-dollar industry. And that, Your Honor, is the reason I was citing Skull Valley, not because I believe that the holding obviously is binding on this Court, because its facts show that a State could simply shut down all nuclear activity by designating the roadway leading up to a nuclear plant as unsuitable for commercial trucking, even if the only commercial trucks that ever go up that roadway are to make deliveries to the facility. But a purpose is usually a subjective concept. But and that's what Congress, that's the term Congress chose to use in 2021K. But is there a way of understanding that as applying an objective standard that doesn't boil down to rational basis review? So the inquiry wouldn't be what was in the minds of these particular legislators, but would a reasonable legislator do enact this particular prohibition if its objective was not disagreement with the Federal regulations? Yes, Your Honor, I think there is, and Justice Kavanaugh, I think this also goes to the concern that you were raising as well. I think that the way you would analyze this is by looking at the text, the legislative history, the historical context in which it was enacted, and the plausibility of any permissible non-safety rationale that the State puts forward. If the State puts forward a plausible non-safety rationale, and that rationale is not otherwise foreclosed by the text, legislative history, and historical context, then I think the State wins. The problem in this case is that the Fourth Circuit effectively assumed that the purpose of this law was to prohibit uranium processing because uranium processing was unsafe, but it held that that was simply irrelevant to the disposition of the case. But, General, even under your standard, we have a problem of mixed motives, because every piece of legislation has a variety of motives behind it. We have a lot of Congressmen with a lot of different purposes. I'm not sure I understand how you're going to solve the problem. In Virginia, we have in this record evidence that they're concerned both about environmental and economic impacts from mining itself as well as with other things. So what do we do with those cases, where at the end of the day it's indeterminate? So two responses, Your Honor. The first, which I'll get off of quickly, because I don't think you're going to find it fully responsive, is that you don't have to address that here, because the Fourth Circuit refused to apply any purpose inquiry at all. But secondly, I think that the answer lies in where the burden of proof is. The burden of proof is on those challenging State law. And if they cannot establish that the principal or predominant purpose of this law was impermissible, then they lose. And so here, the Fourth Circuit refused to undertake any inquiry at all, because it effectively assumed that the purpose was in Petitioner's favor, but concluded that that was irrelevant. Any plausible non-safety rationale? That's your test. I think if it's not foreclosed by the text, legislative history and historical context, and they can establish a plausible rationale at the time that this was adopted, then yes. So that answers Justice Gorsuch's question, because if there is at least one plausible non-safety rationale, that's good enough, or? I think that plausible non-safety rationale has to be sufficient to sustain the law. What does that mean? So, for example, suppose that Virginia put forward a rationale of, we don't like big, huge, ugly holes dug into the Virginia countryside, which is a very plausible rationale. But suppose that in a particular area of Virginia, they actually have tons of big, ugly holes dug in the Virginia countryside by way of coal mines. I think that's very much the case. We've got too many. We don't want any more. Well, Your Honor, and I think that that's exactly the type of analysis that the statute itself requires when it required that type of purpose inquiry. Because I do think otherwise. Otherwise, you really are giving State and local governments a roadmap for undermining a multibillion-dollar industry. Just one other example. General, you've been talking about the undermining of this industry, but I guess a couple of things. One is that as long as there is this other purpose, or as long as the State can say that there's this other purpose, it will just as successfully be able to undermine the industry. And then on the other as well, this statute does give the Federal Government  wants a nuclear industry badly enough. Because in addition to the fact that somebody can import this material from another State or from another country, the Federal Government itself can mine for this material on its own lands, or it can condemn lands and do it with newly acquired lands. So there's a limit to how far any State is able to undermine the Federal goal here. If the Federal goal is real enough. I agree, Your Honor, but two responses to the first part of your question, and then I'd like to address the second part of your question as well. On the first part of your question, we assume that the States engage in good faith. And we assume that the States aren't going to misstate their reasons for doing something. But I will tell you that it is a lot more difficult for a State to, for example, rezone all land that nuclear activity is taking place on as residential, even if it's going to have to come forward and justify that. And may I finish the second point, Your Honor? Briefly? Yes. And in response to the second part of your question, Justice Kagan, yes, the Federal Government can, in certain circumstances, condemn land. But take not something like this case, but take something like an ongoing nuclear facility, where the State is using, under the Fourth Circuit's rule, its authority to rezone that land as residential to completely obstruct it and shut it down. It is a lot more difficult for the Federal Government to come in and condemn an entire operating nuclear power plant. Thank you, Your Honor. Thank you, Counsel. Mr. Heidens? Mr. Chief Justice, and may it please the Court. This is an obstacle preemption case masquerading as a field preemption case. There is no field preemption here because of the undisputed fact that the Nuclear Regulatory Commission cannot and cannot regulate any aspect of uranium mining, including the safety aspects of uranium mining. And there is no obstacle preemption here because the Atomic Energy Act and the Nuclear Regulatory Commission have repeatedly reaffirmed that States have the ability to regulate mining up to and including by banning it altogether. They can regulate milling, correct? Excuse me. The Federal Government regulates milling, Justice Kavanaugh, yes. Yes, so the mining and the milling occur together, correct? In other words, they occur, you don't have mining without milling, you don't have milling without mining. Justice Kavanaugh, there's a way, the in situ leaching process, they literally occur at the same time. If you have conventional mining. I'm sorry, yes. You have to mill before you can mine, that's correct. Right. But I think in many ways what this case boils down to is two questions about Pacific Gas, either one of which is sufficient to resolve this case in our favor. The first question is why the Court conducted a purpose analysis in Pacific Gas? And the second question is what is the nature of the purpose analysis that Pacific Gas did? So let me take the first question, why did the Court do it? The reason the Court did it is because as several members of this Court have already flagged, Pacific Gas was dealing with an area of overlapping shared authority between the Federal and State Government. And I know the yellow brief dwells on this, so I want to quote some of the language in the Court's opinion that addresses this. The Court said at page 194 of its opinion that that case arose at an issue involving the intersection of Federal and State authority. The Court said at pages 211 and 212 of its opinion that it was involving the dual regulation of nuclear-powered energy generation. And the reason the Court did it is because as several members of this Court have already flagged, Pacific Gas was dealing with an area of overlapping shared authority between the Federal and State Government. And the Court said at page 191 of its opinion that it was involving the dual regulation of nuclear-powered energy generation. And the reason the Court did it is because as several members of this Court have already flagged, Pacific Gas was dealing with an issue involving the dual regulation of nuclear-powered energy generation. And the Court said at page 191 of its opinion that it was involving the dual regulation of nuclear-powered energy generation. And, Justice Alito, I don't think it does, and here's why. I think the predicate for 2021K is the existence of an NRC-regulated activity. 2021K has to be read in pari materia with 2021B. 2021B also refers to purpose. And it says that in a situation where the State negotiates for the discontinuance of commission authority, the State, again, gets the right to regulate those activities for purposes of health and safety. And then 2021K comes along and says, just because you haven't gotten a 2021B agreement doesn't mean you can't regulate for other purposes. So why can't? You know, the imagination allows you to think of all kinds of things where they stop the tailing. No one who works in a tailing plant can eat, all right? You know, that's not going to be a real law. But they can't eat. They can't have electricity in the plant. They can't build it in the first place because it's residential. You name it. They have authority in all kinds of places. And all they have to do to stop the tailings is they use this other authority solely in order to stop the tailings. And you say that's just fine. Well, Justice Breyer, I think there are two different reasons why that's distinct from this situation. I know the eating is distinct. But what I'm driving at is the general matter of if I were in a State legislature and you could think of a thousand ways, my guess, is we stop tailings in our State. How? And then you look to an area you can regulate and you regulate that area, but you do it in a way that nobody can build a plant, okay? Now, I don't think that's a far-fetched question. And that's what they say happened here. And I think the answer to your question, Justice Breyer, goes back to a point that Justice Gorsuch made earlier. In that situation, if we're talking about a plant, we are talking about dual overlapping Federal and State authority under 2021. But that's not my question. It's the tailings they can't regulate. Do you get my question? Yes, Justice Breyer. They get a good lawyer, like you, and he finds a different area, and it just turns out that the regulation in this different area will stop them from ever having tailings. And that's why they did it, okay? So that's my problem. Let me try this again, Justice Breyer. When we're talking about a tailings facility, we're in an area of overlapping authority because NRC regulates tailings management. And at that point, you are covered by 2021K, and the Court has to conduct the sort of purpose analysis that's mandated by 2021K. Our submission is that this case is fundamentally different because we are regulating mining. But when you're regulating mining, you're always regulating milling, because you have the two together, but you can't regulate milling, as you acknowledge. But the two are interlinked in a way that I'm not sure you can disaggregate in the way you're doing it. Justice Kavanaugh, I understand that conceptually we could have a metaphysical debate about whether you can separate mining and milling. In the real world, it's not separated. Well, Justice Kavanaugh, in the statute, it's separated. And in NRC's judgment, they're separated. I think the best evidence of that, it's discussed in our brief, it's the hydro resources decision of NRC. So this is a case in which NRC is regulating an activity that they have the authority to regulate. It's a milling process, right? And NRC has argued that as part of their regulation of milling, they should take into account background radiation that exists because of previously un-NRC regulated mining. And NRC says, we can't do that. We're not allowed to take into account the consequences of previous mining activities, because we, NRC, have no authority to regulate mining. Even though we have authority to regulate milling, we, NRC, can't regulate mining. And even taking into account radiation that exists because of that previous mining, would constitute impermissible NRC regulation of mining. And so I think regardless of whether, as a metaphysical level, we could say milling and mining are so inextricably intertwined that the regulation of one is necessarily the regulation of the other. I think both Congress and the text of the statute, right? So that's the other point. This statute, from the beginning, has given NRC the ability to regulate milling. And in the entire history of this Act, NRC has never once advanced the argument, as far as we're aware, that says because we can regulate milling, A for sure, all right, we can regulate mining, because mining is inextricably intertwined with milling. In fact, NRC has aggressively disclaimed that argument in a decision where a great deal actually turned on that argument. But the second question, to raise Justice Breyer, to go back to Justice Breyer. So I think the first reason that Justice Breyer's example isn't covered by this situation is that we concede, once we're dealing with an NRC regulated activity, a tailings facility, 2021K requires some sort of purpose analysis. That's why the Court did a purpose analysis in Pacific Gas. And that's also why Skull Valley is right? Yes, Justice Kagan. Because the vast majority of the activities in Skull Valley were NRC regulated activities, and we have no quarrel with that decision whatsoever. But the other reason is, even if, so to go back to Justice Alito's hypothetical, excuse me, even if it appeared on the face of the statute. The first reason we think that that law is not preempted, and if that law is not preempted, this law is obviously not preempted. But even if the Court were inclined to reserve judgment or to carve out an exception for a law where that sort of purpose is stated on the text or the face of the statute, there would be no justification for unleashing the all-things-considered subjective and motivations of the State legislature that we see in the blue brief and the yellow brief. And here, I think what's not a motive in my opinion, it's a bad word, because you don't know people's motives. You don't normally look into that. Motives can be backward-looking. He did it out of revenge. They can be referring solely to a past fact. He hit my sister. That's why. But we're concerned with the subset of that where we're looking to the future. And I think you're right to say that's purpose. When we talk about, and every judge, as far as I know, including Justice Scalia, whom we used to talk about this, sometimes will look to a statute's purpose. Go back to Lord Cook. Go back as far as you want. Name any judge in American history who's been heard of. Of course, we have a dozen ways of looking at purpose. So what's wrong with looking at purpose here? I grant you, a State legislature, unlike Congress, is less likely to hold on-the-record hearings about a statute. But then that would be a reason for saying, when we try to determine purpose, we do not look necessarily to legislative history as written in committee reports because there aren't any. Now, Justice Scalia and I could have a lot of arguments about whether you do, whether you don't, but that's beside the point. When you say don't look at purpose, there I get off the boat because I think that's our job as a court in a relevant case to determine what the purpose of the statute is. Sometimes it's easy. Sometimes it's tough. So what's wrong with what I just said? I think I have two answers, Justice Breyer. The first one is that when we're dealing with a State legislature, which is fundamentally, as you say, unlike Congress, and it's unlike Congress in a different way, a State legislature does not have to show its authority to do something. Under our Federal system, the challenger has to show why a State legislature may not do something. So the first thing I'd say is we'd have to know why would the purpose of this law matter, and to go back to I think something that was brought up by Justice Gorsuch, our fundamental view is because Congress does not regulate mining in any way, in any shape or any form, it does not matter the purpose for which Virginia has chosen to forbid mining. But even if the Court wanted to carve out an exception for the case that we've talked about earlier, I think Justice Breyer is absolutely right. I think the purpose of the statute is an orthodox question of statutory interpretation and should be determined the way the Court normally does. The face of this statute regulates mining. The face of this statute cites environmental and natural resources consequences that flow from mining. And what does that mean? Ginsburg. You had it in your brief. Let's see. You said there was a plausible purpose other than to prevent nuclear development. And you say the possibility that certain impacts of uranium development activity may reduce or potentially limit certain uses of Virginia environmental resources. And I don't know what that means. Fair enough, Justice Ginsburg. I mean, I think we think it's fairly apparent what those would mean in the context of this situation. This would be a massive, earth-moving mine operation. There's a statistic that's in the Federal Government's cert stage amicus brief where they say that to get 1 to 5 pounds of uranium, you have to displace 1 ton of dirt to get 1 to 5 pounds of uranium. This would be a massive disruption of Virginia's scenic beauty. We're talking about a fundamentally, profoundly rural area of Virginia that's building its economy based on agriculture and tourism. And I think it's fairly obvious how that would have a significant impact on Virginia's environment and natural resources, which is why this case. I'm trying to envision. You know, 1 ton sounds like a lot. But a ton of dirt, how much is that? That's probably not that much. I mean, are you talking a truckload or what? Perhaps, Mr. Chief Justice. But our friends on the other side, it's also not 1 pound of uranium. Our friends on the other side say this deposit is 100, I believe it's 119, it's either ton, it's an enormous quantity. They're not, they don't want to mine 1 to 5 pounds of uranium. They want to mine what they themselves describe as the largest deposits of uranium in the continental United, in the United States. If Virginia allows coal mining and has a fair amount of coal mining in the western part of the state, so could a court compare coal mining with uranium mining and see if there's something that, if one is more disruptive to the scenery than the other or one is more dangerous to miners than the other, something like that. So you could ask whether it's plausible that this was done for some reason other than just the fact that Virginia disagrees with the NRC that the tailings can be dealt with in a safe way. And Justice Alito, I think there is an apparent and obvious explanation that is all, that the court doesn't need to do anything beyond. It's something that Chief Justice flagged. There is, Virginia could easily decide that there is a world of difference. I mean, the analogy I've thought of here is the removal of Ten Commandments monuments, right? Where Virginia could easily decide that there is a world of difference between telling people and companies and communities that have built their economic livelihood around coal mining that we are not going to shut those down and disrupt the entire way of life in an area. There's a world of difference between saying that is, and we do not intend to start a massive mining operation in a part of the State that has never had such a mining operation. Well, that may be. You could have a moratorium on mining, period. You could have a moratorium, no more mining of anything in Virginia. You could have that. We certainly could. But that's not what the legislature did here. It's not what they did. And it's also, what the court in Pacific Gas said, it's not what California was required to do, because there was an argument that was made in Pacific Gas that if California really meant their proffered rationale, there are other steps that California could have and perhaps would have taken if they wanted to pursue that goal at all costs. If we don't... I'm sorry. Please. No, go ahead. If we don't accept your broader position, what do you think of the Solicitor General's suggestion that we look at whether the State has a plausible non-safety rationale? We think that's the language of the court. Once you decide to do purpose, that's the second point I was making earlier. If you decide to do purpose, we think that's the way you should do purpose. It's the way the court did purpose in Pacific Gas, and we think that under that, we clearly win, because we are materially indistinguishable from California and Pacific Gas. But you, at the pleading stage, you made a concession, and that a purpose of the ban was to address radiological safety concerns. Why did you make that concession? Well, Justice Ginsburg, I'm glad to have the opportunity to address that. We didn't concede anything. What we did is we moved to dismiss, and we acknowledged. All of the quotes they cite from our lower court briefing, what we say is we acknowledge that as a party who moves to dismiss, we are required to assume the truth of all well pleaded factual allegations in the complaint. So to the extent they have to. Well, why did you even do that? Why is this a factual allegation? Well, to the extent that what was in someone's mind when they did something, I think that is a factual allegation, but our submission is that's not relevant and that's not how you do it. It's not about what's in their mind. There is a well known, sometimes laughed at, sometimes I do think it's great, a reasonable legislator. The reasonable legislator is called a legislative, a judicial invention. And the reason they invent it is so that they can work out obscure provisions of the statutes and what their real purpose is and what they mean. Now, that, too, has been used for hundreds of, I don't know, hundreds, but many, many, many years. So we don't have to look in their minds, do we? Well, Justice Breyer, that is exactly what the Petitioners are asking you to do. The statements that are. Maybe, but regardless, my question is why do you have to look in their minds? What you do is the same thing you do with a Federal statute, what you do with statutes every day. You get provisions and you say, reading the words, reading the applications, da, da, da, da, da, you know, fill in the blanks. What would a reasonable legislator have wanted this purpose? What purpose would it have served? I think I've done that perhaps wrongly. I don't think so. Hundreds of times. Okay? So all they want is a chance to show that. But here you say you don't even get a chance to show it. Justice Breyer, we agree with everything you just said about purpose. And it brings me back to my answer to Justice Kagan and Justice Ginsburg. Excuse me. The statements in the brief that they're citing before this Court are statements where we say the Court should not consider these hundreds of pages of statements where people offer their subjective perspective on why they did what they did. We say all of those materials are beside the point. So what happened here is that the Court should not consider these hundreds of pages of statements where people offer their subjective perspective on why they did what they did. But to layer purpose on top of it introduces all the complications that Justice Kagan has alluded to, which is if we're going to start inquiring into purpose, one state may not be able to do the same thing another state may be able to do, simply because of our assessment of what was in somebody's mind. And if we start looking at this statute, I don't even know where to begin. Because it talks about the environmental and local resource impacts of mining and milling and tailings and everything else. Now, could a rational legislator have done this only for concern about mining? Maybe. If I'm going to start going down the road of what's in somebody's head and subjective intentions of even an imaginary, hypothetical, reasonable legislator, I don't know. Well, Justice Gorsuch, we absolutely agree with you, which is why our primary submission is that because this is not an area that's regulated by the Federal Government at all, you don't do any sort of purpose analysis. Our primary submission is that exactly what you just said, Justice Gorsuch, that there's no warrant to do that, there's no need to do that, and the Court shouldn't  Sotomayor, where do we draw the line, or how do we draw it, between the Skull decision and the Second Circuit Vermont decision? Their activities that the State were alleged to be doing were intended and did, in fact, affect regulated conduct by the Federal Government. But one could say here, if you prohibit mining, you're affecting milling or disposal. Right. So how – where and how do we draw the line between that regulation that we're permitted to look to purpose for and that which we're not? Right. The line we think is straightforward. It's based on the text of the statute. It's NRC-regulated activity, because in both the Skull Valley decision and in the Skull Valley decision, the State was acting upon and regulating something that is itself regulated by NRC. The spent nuclear fuels facility in Skull Valley was regulated by NRC. The Vermont Yankee nuclear power plant was certainly regulated by NRC. And the Court would do – now, I want to bring up the roads provision, because Mr. Cooper mentioned them. They say there's this one provision of the law at issue in Skull Valley that turns a county road into a State road. Well, I'd say two things about that provision. First, if that's literally all that Utah did, all Utah did was to convert a road from a county road to a State road, and that's the only thing they did, there would be no basis whatsoever for finding that law standing alone was preempted by the Atomic Energy Act. And to the extent that it operated, I think there was also discussion of the National Meats case, which I think is affirmatively helpful for us, because at the end of the opinion in National Meat, the Court got to the sales provision of the California  And the Court said, you know, this doesn't directly act upon the conduct that's regulated by Federal law, and so I guess you could make an argument. The Humane Society made the argument. That's not preempted. And here's what the Court actually said in National Meat. That argument ignores the way that the sales provision operates within State law as a whole. California didn't enact the sales provision as a freestanding provision. They enacted the sales provision as part of an interrelated series of laws that, in the Court's language, regulated the same thing as the Federal government, just in a different way. And we think that's directly on point, because when this Court CVSG-ed in Skull Valley, the Solicitor General's CVSG brief adopted that precise rationale when it came to the Rhodes provision. It said the Rhodes provision has to be analyzed as part of how Utah's entire scheme is regulating the spent nuclear fuels facility. You have to look at the scheme as a whole, and you have to look at how the entirety of the series of interrelated laws work. So 20 21 section C, 20 21C, 4, says that the Commission shall retain the authority to regulate the disposal of byproduct. And then K says nothing, and that is that regulatory authority, I take it, which is the statutory basis of the preemption argument. And K says nothing in this section shall be construed to affect the authority of a State or local agency, so forth. So how do you – why is it tied – why do you say K is tied solely to licensing? Sure. Well, Justice Alito, first, this case we're not talking about byproduct. We're talking about source material. And the reason that that is critically important, I don't think I'm just quibbling over terminology, is because when we're talking about source material, both 20 19 Well, it goes on to say the disposal of such other byproducts source or special nuclear material.  But it's – but you have to read that in conjunction with 20 20 92 and 20 – 20 95, both of which specifically say that NRC jurisdiction over source material does not even begin or commence until after that source material is removed from the ground. Congress was very clear. They have a belt and suspenders approach. They don't just say that NRC can't regulate the transfer of source material. That's 20 92. They go even further in 20 95. I mean, this is an extraordinary provision. It prohibits NRC from even requesting reports about source material until after it's out of the ground. NRC has literally no authority over source material until it leaves the ground. But do you dispute the fact that the NRC has – occupies the field of regulation of source material? After it leaves the ground. After it leaves the ground. But that's the critical distinction in this case, because our whole point, that is the predicate of our argument. Yeah, but if the – if a State law indirectly, surreptitiously regulates the same thing, it would fall within the prohibited field. Justice Alito, I guess I'd have to know – I'd have to have a little more information about what we mean by indirectly or surreptitiously regulates the same thing. Because it's certainly – if we're talking about Petitioner's strong version of that preemption argument in Pacific Gas. Because think about the argument that California – excuse me, not California – that Pacific Gas and the Federal Government made for preemption in that case. Of course, allowing the nation's largest State to prevent nuclear power construction – nuclear power plant construction, of course that is going to have a profound impact on the civilian nuclear power industry in the United States. And the Court acknowledged that. And the Court said, no, we understand. California could do that. But we've concluded that Congress has nonetheless given California the right to regulate for economic safety reasons, and it is for Congress, not for this Court – this is what the Court specifically said in Pacific Gas – if Congress concludes that California is misusing the authority that has been left to them, it is for Congress to tell the State that. And – but I'll just go back to the point that – But of course, Mr. Huytens, not for reasons having to do with radiological safety. Yes. And I suppose one way to understand this – the preemptive field here is that it surely extends to various kinds of activities, and this is not one of those activities, the mining. But in addition, it extends to judgments about radiological safety even outside those activities, on the theory that the NRC is the proper body to make judgments about radiological safety, and we don't want 50 States to be making their own. So I suppose that's a way to explain the opposite position. I agree with that, Justice Kagan, but I think the very last thing you said shows why that argument can't possibly be right. NRC lacks the authority to regulate even the radiological safety aspects of mining. So the logical – if you define the field that way, the logical implication of that argument is that there is literally no one who has the authority to regulate radiological safety aspects of uranium mining, because the NRC can't do it, because the NRC has repeatedly reaffirmed that they have no power to do anything. Aren't the radiological safety issues posed by the milling far more than the mining? I thought that was why you're concerned about the milling. To Justice Alito's point, it's a way to prohibit the milling. You can't do that. Let's prohibit the mining. That way we prohibit the milling, which has the radiological safety concerns. I think that's the – Sure. That's the point. Justice Kavanaugh, I think that's right, and I think part of the reason that Congress has given NRC jurisdiction over the milling is because of those various concerns. Just one technical point on phrasing. The Solicitor General said plausible non-safety rationale. I assume you would amend that to say plausible non-radiological safety rationale. Yes, I would, Justice Kavanaugh. And I think that's consistent with what they've said in their briefing. I think at the cert stage they said we could regulate mining, even the safety aspects of mining, as long as we're doing it based on the mining. And to take your point, Justice Kavanaugh, I think there's three possibilities. There's the radiological safety aspects of uranium sitting in the ground. There's the radiological safety aspects of the mining process. And there's the radiological safety aspects of the milling. I agree with you completely. The reason you give NRC jurisdiction over the third is the conclusion that that poses special concerns. It's all of the concerns, isn't it, on radiological safety? Almost all. I want to amend it to almost all, Justice Kavanaugh. I know there's discussion in some of the briefing in this case that suggests that there are radiological concerns associated with the mining process itself. Congress said that sitting in the ground, excuse me, a committee report from 1946 says that sitting in the ground, uranium does not create radiological safety concerns. But there's the separate question of whether the process of digging it out of the ground raises any radiological safety concerns. And I think there's at least some evidence in some of the briefing that there may be at least some radiological safety concerns associated with doing that, without saying that the same is milling. And regardless of whether there are radiological safety concerns, there are clearly a wide variety of health and safety concerns associated with extracting massive amounts of material out of the ground. And so we think that at the end of the day, the purpose, this Court has reaffirmed repeatedly, that the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone. And we think the single clearest and completely dispositive decision by Congress in this case was the decision it made in 1946, that it reaffirmed in 1954, and it has left undisturbed until the present day, that the Federal Government does not regulate uranium mining. For that reason, Virginia's inherent sovereign ability to control something as fundamental as what material gets pulled out of the ground remains fully intact, its bans should not be preempted, and this Court should affirm. Thank you. Roberts. Thank you, counsel. Four minutes, Mr. Cooper. Thank you, Mr. Chief Justice and Justice Kavanaugh. I want to come straight to your point that you cannot mill mining unless you have to mill uranium unless you have mined it in the first place. There were two ways for Virginia to prohibit milling and tailings management, both of which they were concerned about. They weren't concerned about radiological aspects of mining, quam mining, any more than the NRC is. It's the milling and the tailings that represent the threat of nuclear safety. And there were two ways they could do it. They could do it directly. We prohibit milling in this State. But that would have run straight into a stop sign, Your Honor, of preemption. There's no way they could do it. Suppose they say our rationale does have to do with the mining, not the milling. We think there are radiological hazards from the unearthing the uranium. Suppose they said that. Your Honor, they could say that, but a court would have to look behind it, would have to look behind it using all the techniques that my friend, the Solicitor General, has mentioned, including plausibility. But to come back, Justice Kavanaugh, I want to make clear that the Court understands, as Justice Gorsuch has referenced, that the statute that banned mining had sister provisions. In the very same breath, Virginia enacted a uranium administrative group tasking it with the responsibility to study uranium mining in Virginia and milling and tailings. On page 185, I would refer the Court to 185 through 187. With respect to milling activity, the capacity, these are the things that you're supposed to study. The capacity of the mill, the processing to be used in milling and ore extraction, the reagents and processing material, the method for conveying tailings and wastewater from milling. The next paragraph. With respect to tailings management, the quantity and characteristics of the tailings, the method of disposal, treatment systems for removal of solids, radionuclides, on and on for the next several pages. The courts below and my friends for the Commonwealth have focused myopically on the one sentence that is the ban. What was really happening here and the purpose of this was to prohibit milling and tailings management. The only thing that really represents serious radiological hazards. Second point. Dual regulation. My friend quotes from PG&E, Justice Gorsuch, and I want to finish his quote. He didn't get to finish it. Congress has preserved the dual regulation of nuclear powered electricity generation. This is from 212, 211, 212. The federal government maintains complete control of the safety and nuclear aspects of energy generation. The states exercise that, their traditional authority, Justice Gorsuch, traditional authority, which they've always exercised over the generation transmission and sale of electricity. Over the need for additional generating capacity, the type of generating facilities to be licensed, are they going to be coal or nuclear? Your Honor, in California, in PG&E, California had the antecedent authority, its and its alone, to decide whether there would be a plant of any kind, including a nuclear plant. And if there was no nuclear plant, there could be no NRC authority or regulation over how that thing was constructed or how it was operated. My final point here. Plausible, non-safety rationale. This is the one place where I guess I do disagree with my friend, the Solicitor General. That sounds too much to me like rational basis review. Like any conceivable thing that the state could bring forward or a judge could even conceive of, will do the trick. That's not what Congress had in mind when it said, courts, look at the purpose. Is the purpose for the protection against radiological hazards? That's what Congress wants you to decide. And not just is it any plausible purpose, is that the purpose? And you have to do your best, it's not easy. But that's the question that Congress has said is before the courts. And if the courts conclude in their best effort that that's the purpose, well, then it's preempted. Thank you, Your Honor. Thank you, counsel. The case is submitted.